**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| IN RE: | ) | Bankruptcy No. 19-70748-JAD |
| | ) | |
| DAVID LYNN RECKART, | ) | Chapter 12 |
| CAROLYN ANNE RECKART, | ) | |
| | ) | Related to Doc. No. 67 |
| Debtors. | ) | |
| _____ | X | |
| | ) | |
| STATE EMPLOYEES CREDIT | ) | |
| UNION OF MARYLAND, INC., | ) | |
| | ) | |
| Movant, | ) | |
| | ) | |
| -vs.- | ) | |
| | ) | |
| DAVID LYNN RECKART, | ) | |
| CAROLYN ANNE RECKART, and | ) | |
| RONDA J. WINNECOUR, ESQUIRE, | ) | |
| | ) | |
| Respondents. | ) | |
| _____ | X | |

## <u>MEMORANDUM OPINION</u>

The matter before the Court is the *Motion for Prospective In-Rem Relief From the Automatic Stay* (the "<u>Relief From Stay Motion</u>," ECF No. 67) filed by the Movant, State Employees Credit Union of Maryland, Inc. (the "<u>Movant</u>" or "<u>SECU</u>").[1] For the reasons set forth below, a conditional order shall be entered granting relief from stay, but staying the effects of such relief pending certain actions by the Debtors.

---

[1] This Court has subject matter jurisdiction to enter a final judgment pursuant to 28 U.S.C. §§ 157 and 1334. This is a core matter pursuant to 11 U.S.C. § 157(b)(2)(G). Moreover, to the extent this matter is found to be non-core, the parties consent to this Court's entry of a final order. <u>See</u> *Joint Pretrial Statement*, ECF No. 99, pg. 1.

<u>I.</u>

Debtors are the owners of real property located at 130 Horse Ranch Road, Artemas, PA 17211 (the "<u>Property</u>") on which they live and—as the street name suggests—operate a horse farm.

On September 25, 2013, the Debtors executed a Note in favor of SECU in the original principal amount of $108,800.00 (the "<u>Note</u>"). <u>See</u> Joint Pretrial Statement 3, ¶ 2. As collateral for the Note, the Debtors also executed a Mortgage in favor of SECU secured by the Property. <u>See</u> Joint Pretrial Statement 3, ¶ 3. The Debtors defaulted on the Note and SECU commenced an action in foreclosure in the Court of Common Pleas of Bedford County, Pennsylvania, which ultimately resulted in the entry of a final judgment in favor of SECU on October 12, 2017, in the amount of $102,111.17.  <u>See</u> Joint Pretrial Statement 3, ¶ 6.  The events occurring thereafter form the basis of SECU's claim under 11 U.S.C. § 362(d)(4).

Following entry of the final judgment, a sheriff's sale to enforce the judgment against the Property was scheduled for April 12, 2018. <u>See</u> Joint Pretrial Statement 4, ¶ 12. On the day prior to the scheduled sale, the Debtors commenced a joint chapter 13 bankruptcy case in the Northern District of West Virginia[2], identified as case no. 18-00338. However, the Debtors' attempts to reorganize under chapter 13 were unsuccessful and the Debtors eventually

---

[2] It was stipulated at the evidentiary hearing on the Relief From Stay Motion that the Joint Pretrial Statement errantly listed case no. 18-00338 as being filed in the Western District of Virginia. <u>See</u> Transcript 7:14-22, ECF No. 115.

converted their case to one under chapter 7 of the Bankruptcy Code. <u>See</u> Joint Pretrial Statement 4, ¶ 11. A chapter 7 discharge was entered March 12, 2019.

Following the 2018 bankruptcy case, a sheriff's sale was once again scheduled for August 8, 2019. Joint Pretrial Statement 4, ¶ 14. On the eve of that sheriff's sale (August 7, 2019), the Debtors commenced a pro se chapter 13 case in the Western District of Pennsylvania at case no. 19-70483. Joint Pretrial Statement 4, ¶ 13. However, that case was eventually dismissed on November 26, 2019, due to the failure of the pro se Debtors to file the necessary schedules and filings.

A sheriff's sale on the Property to enforce SECU's judgment was again scheduled for December 12, 2019. That brings us to the current case, which—like the others before it—was filed the day before the sheriff's sale on December 11, 2019. <u>See</u> Joint Pretrial Statement 4, ¶¶ 15-16. This case, however, was not filed under chapter 13 of the Code, but under chapter 12 which is designated "Adjustment of Debts of a Family Farmer or Fisherman with Regular Annual Income." <u>See</u> 11 U.S.C. § 1201, et seq.

On June 17, 2020, SECU filed its Relief From Stay Motion alleging that it was entitled to in-rem relief under 11 U.S.C. § 362(d)(4), citing the Debtors' combined total five bankruptcy filings spanning a period of over twenty years (two of those cases were filed prior to SECU's encumbrance of the Property.) Also under 11 U.S.C. § 362(d), SECU averred that pursuant to §§ 362(d)(1) and (2), that SECU was not adequately protected and will suffer irreparable harm if relief is not granted. That the Debtors lacked equity in the Property and it was not

necessary for an effective reorganization. Also, that the Debtors' current case was filed in bad faith, arguing that the Debtors' intentions were merely to forestall SECU's enforcement of its judgment in foreclosure, and not for purposes of gaining a fresh start. Alternatively, SECU requested that the Debtors make adequate protection payments of $2,000 per month.

Naturally, the Debtors deny any ill intent and refute that relief from stay is appropriate under the circumstances. The Debtors also raised a new matter, seeking a denial of SECU's request for waiver of the fourteen-day stay should relief be granted.

II.

A.    Relief Under 11 U.S.C. § 362(d)(4)

For context, section 362(d)(4) of the Bankruptcy Code is a relatively newer section having been added pursuant to the Bankruptcy Abuse Prevention and Consumer Protection Act of 2005 ("BAPCPA") for the intended purpose of reducing abusive filings. See In re Duncan & Forbes Dev., Inc., 368 B.R. 27, 31 (Bankr. C.D.Cal. 2007)(citing H.R. Rep. No. 109-31(1) at 70 (2005), as reprinted in 2005 U.S.C.C.A.N. 88, 138-39).

Section 362(d)(4) of the Bankruptcy Code provides as follows:

(d) On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay--

   (4) with respect to a stay of an act against real property under subsection (a), by a creditor whose claim is secured by an interest in such real property, if the court finds that the filing of the petition was part of a scheme to delay, hinder, or defraud creditors that involved either--

4

> (A) transfer of all or part ownership of, or other interest in, such real property without the consent of the secured creditor or court approval; or
> (B) multiple bankruptcy filings affecting such real property.
>
> If recorded in compliance with applicable State laws governing notices of interests or liens in real property, an order entered under paragraph (4) shall be binding in any other case under this title purporting to affect such real property filed not later than 2 years after the date of the entry of such order by the court, except that a debtor in a subsequent case under this title may move for relief from such order based upon changed circumstances or for good cause shown, after notice and a hearing. Any Federal, State, or local governmental unit that accepts notices of interests or liens in real property shall accept any certified copy of an order described in this subsection for indexing and recording.

11 U.S.C.A. § 362(d)(4) (West).

In essence, section 362(d)(4) provides what is often referred to as "in-rem" relief to an aggrieved creditor which would prevent subsequent bankruptcy filings by any person(s) from forestalling collection efforts against the subject property for a period of two years.

Here, SECU alleges that relief is warranted under § 362(d)(4)(B) pointing to the Debtors' collective five bankruptcy filings.[3] See *Post-Hearing Trial Brief in*

---

[3] In the Relief From Stay Motion, SECU broadly requests relief pursuant to § 362(d)(4). In their *Joint Pretrial Statement*, the parties appeared to limit the request to one under § 362(d)(4)(A). See Joint Pretrial Statement 1 ("The basis of the Court's jurisdiction in this matter is 11 U.S.C. § 362(d)(4)(A)[]" and "[SECU] seeks relief from the automatic stay pursuant to 11 U.S.C. § 362(d)(4)(A) . . . .") See also id. at 12 (listing the contested issues of law to be litigated as arising under 11 U.S.C. § 362(d)(4)(A)). That subsection arises in situations in which a secured property is transferred without the secured creditor's consent versus subsection (B), which concerns multiple bankruptcy filings. See 11 U.S.C. § 362(d)(4)(A). Nonetheless, in SECU's post-hearing brief, SECU cites to 11 U.S.C. § 362(d)(4)(B) and appears to assert its claim thereunder. See SECU Brief 2. The Debtors filed their post-hearing brief prior to SECU's and therein, recognized that "[SECU] focuses on *in rem* relief under *§ 362(d)(4)(A)* specifically." See Debtors' Brief 2, ECF No. 117. However, the Debtors also cited 11 U.S.C. § 362(d)(4)(B) and tailor their arguments towards that subsection. See Debtors' Brief 3 ("Before a court may grant *in*

5

*Support of Motion for Prospective In-Rem Relief From the Automatic Stay* ("SECU Brief"), ECF No. 121, at 2.

The parties agree that as Movant, SECU bears the burden of proof for its § 362(d)(4) claims. See SECU Brief 2, Debtors' Brief 1. See also United States v. Olayer (In re Olayer), 577 B.R. 464, 468 (Bankr. W.D.Pa. 2017).[4] By separate judge, this Court has recognized that the severity of *in rem* relief warrants due consideration. "Because *in rem* relief is extraordinary and imposes consequences beyond the contours of the present bankruptcy case, it is not to be taken lightly." In re Olayer, 577 B.R. 464, 470 (Bankr. W.D. Pa. 2017).

By the terms of the statute, the factors in considering whether in rem relief under 11 U.S.C. § 362(d)(4)(B) is appropriate include: (1) whether the debtor was engaged in a "scheme," (2) to delay, hinder, or defraud a creditor, (3) that involves multiple bankruptcy filings affecting the real property.

The satisfaction of the second factor is apparent from the procedural history in this case in that SECU has undoubtedly been "delayed" in the enforcement of their October 12, 2017 judgment by the Debtors' three most recent bankruptcy filings—each on the eve of sheriff's sale. Indeed, by their

---

*rem* relief concerning real property, the property first must be involved in multiple bankruptcies.")  Therefore, no party appears to be prejudiced by this Court reviewing SECU's request for relief pursuant to § 362(d)(4)(B).

[4] Although the parties agree that the Movant bears the burden of proof on the 11 U.S.C. § 362(d)(4) claim, the parties did not point to any caselaw definitively setting forth the threshold of the burden in this circuit. The Debtors suggest a more stringent "clear and convincing evidence" standard. See Debtors' Brief 2.  However, such determination is not required herein, as the preponderance of the evidence is that the Debtors have not engaged in a "scheme" involving multiple bankruptcy cases.

filings, the Debtors have delayed the enforcement by over two-and-a-half years in relation to the first cancelled sheriff's sale scheduled for April 12, 2018.

Thus, issues for determination are whether the Debtors were engaged in a "scheme" to achieve that delay, which includes multiple bankruptcies.

"In the context of § 362(d)(4), a 'scheme . . . implies a level of insidiousness and deceitfulness.'" McKeesport Area School Dist. v. City of Pittsburgh Prop. Dev., Inc. (In re City of Pittsburgh Prop. Dev., Inc.), 580 B.R. 130, 134 (Bankr. W.D.Pa. 2018)(quoting In re 177 Weston Rd., LLC, No. 11-50657, 2011 WL 3032745, at *2 (Bankr. D. Conn. July 22, 2011)).  Se also In re Duncan & Forbes Dev., Inc., 368 B.R. 27, 32 (Bankr. C.D.Cal. 2006)(finding a "scheme" under § 362(d)(4) to consist of an "an intentional artful plot or plan" with the "nefarious purposes" to "delay, hinder or defraud creditors.")  "[A] showing of good faith weighs against the existence of a scheme to delay, hinder, or defraud." In re City of Pittsburgh Prop. Dev., Inc., 580 B.R. at 135.

SECU alleges that relief is appropriate based on the timing of the Debtors' three most recent bankruptcy filings on the eve of foreclosure, which SECU describes as strategic. See SECU Brief 2-3. And which SECU also describes as being for the limited purpose of staying the sheriff sales. See SECU Brief 3. Further alleging that none of these bankruptcy cases have moved forward with "meaningful operations of farming or horseback riding income being generated" to support reorganization. See SECU Brief 3. SECU additionally avers that a presumption of bad faith exists pursuant to 11 U.S.C. §§ 362(c)(3)(C)(i)(II) and (III).

Whether "in rem" relief is warranted pursuant to 11 U.S.C. § 362(d)(4) on account of multiple case filings was discussed by my colleague on this Bankruptcy Court, the Honorable Gregory L. Taddonio, in United States v. Olayer (In re Olayer), 577 B.R. 464 (Bankr. W.D.Pa. 2017). In that case the debtors had filed five bankruptcy cases over a period of twenty-one years—with filings in March 1996, November 1996, April 2000 (after commencement of mortgage foreclosure proceedings), March 16, 2010 (after failure to make extra-plan payments and on the eve of U.S. Marshal's sale), and August 22, 2017 (two days before U.S. Marshal's sale). In re Olayer, at 467-468.

After the filing of the fifth case, the debtor's secured creditor sought relief under § 362(d)(4). The court denied relief on this basis, noting that:

> The mere existence of "[m]ultiple bankruptcy filings do[es] not alone justify relief" unless they are part of such a scheme. Strategically timing a bankruptcy to stay or cancel foreclosure proceedings can be a legitimate tactic within a debtor's arsenal, but it evokes bad faith where a debtor commences a bankruptcy case "without the ability or the intention to reorganize." In the past, this Court has suggested that serial filings compounded by a lack of payments, "highly-questionable plan," and "tag team" approach to individual filings by a husband and wife may warrant *in rem* relief.

In re Olayer, at 468–69 (footnotes omitted). See also In re Gray, 558 F.App'x 163, 166 (3d Cir. Mar. 7, 2014)("Multiple bankruptcy filings do not alone justify relief under 11 U.S.C. § 362(d)(4)(B), however. Under the statute, those filings, as well as the petition in this case, must be 'part of a scheme to delay, hinder, or defraud creditors' of the [relevant property.]' "[5])

---

[5] In Gray, the Third Circuit took issue with the record before it, observing that while the debtor had been a party to multiple bankruptcy filings, neither the moving creditor nor

In particular, the bankruptcy court noted that had the creditor sought the same relief at the out-set of the fourth bankruptcy case, then relief *may* have been granted as the first two cases did not last more than six months each and the debtor failed to meet plan obligations during the third. Moreover, that outside of bankruptcy court the debtor had further delayed the creditor's execution against the property at issue by over two-and-a-half years through appeal of the federal award in mortgage foreclosure. See Olayer, at 469. However, the court found that the fourth case was not part of a "scheme to delay, hinder, or defraud" in that, although protracted over six years, the debtor was able to achieve confirmation of a plan and obtain a discharge. Noting that:

> This relentless pursuit of a solution stands in stark contrast to the Mazza debtors, who were unable to pay the filing fee or produce a completed petition at the outset of their case. Most significantly, [the moving creditor] received a substantial payout during the 2010 bankruptcy, notwithstanding Olayer's failure to make several payments outside of the confirmed plan.

In re Olayer, at 469–70.

As noted, Judge Taddonio contrasted the facts of Olayer with that of Mazza v. Bank of N.Y. Mellon (In re Mazza), No. 14-cv-6423, 2015 WL 5729262 ((E.D. Pa. Sept. 30, 2015). In Mazza, the debtor-husband individually commenced three chapter 7 bankruptcy cases over the course of one year achieving a delay of the couple's foreclosure proceedings at strategic times. Each of the debtor-husband's bankruptcy proceedings were dismissed approximately two months after commencement either due to failure to file the requisite schedules or failure to

---

the lower courts put the bankruptcies in context as to how they related to or affected the relevant property. See In re Gray, 558 F.App'x at *166.

pay the filing fee. See Mazza, at *5. A little over two months after the dismissal

of the husband's third bankruptcy case, the wife then filed her own chapter 7

case, prompting the secured creditor to move for in-rem relief from stay. In this

fourth collective case, the debtor-wife also failed to file the requisite documents.

The bankruptcy court granted the in-rem relief request, citing the couples'

abusive history of filing, a lack of payment for years, and that there was no

proposal in the chapter 7 filing to cure the deficiencies. See Mazza, at *3.

On appeal, the District Court upheld the decision, observing that "[t]here

is no evidence of the debtors' change of circumstances between any of these filing

or any efforts to attempt reorganization." See Mazza at *5. The court noted:

> The bankruptcy petitions were timed strategically to stay upcoming
> trial dates in the state foreclosure matter and are therefore evidence
> of Debtor's scheme to delay or hinder the Bank. See In re Hymes,
> No. A12-00599, 2013 Bankr. LEXIS 664, at *21, 2013 WL 653060
> (Bankr. D. Alaska 2013) (concluding that the timing and
> circumstances of the bankruptcies were evidence of a scheme to
> hinder and delay the foreclosure sale of the property); In re Blair,
> No. 09-76150, 2009 Bankr. LEXIS 4195, at *12-13, 2009 WL
> 5203738 (Bankr. E.D.N.Y. Dec. 21, 2009) (holding that "the mere
> timing and filing of several bankruptcy cases is an adequate basis
> from which a court can draw a permissible inference that the filing
> of a subsequent case was part of a scheme to hinder, delay, and
> defraud creditors"). Further evidence that these filings constituted a
> scheme to delay or hinder is that none of the cases moved forward,
> having apparently served their purpose of staying the foreclosure
> proceedings. All four cases, filed within fourteen months of one
> another, were dismissed approximately two months after they were
> filed for either the debtors' failure to pay the filing fee or to file the
> required bankruptcy documents. See In re Montalvo, 416 B.R. 381
> (Bankr. E.D.N.Y. 2009) (holding that the "timing and sequencing of
> the filings is also significant," noting that "[e]ach was filed on the eve
> of or shortly before significant events affecting the Property" and that
> the "lack of any good faith prosecution of these cases allow this
> Court to draw a permissible inference and find that the instant
> petition was part of a scheme of Debtor to delay, hinder, and
> defraud").

<u>Mazza</u> at *5.

Collectively, the Debtors have five bankruptcy filings between them as summarized below:

| Case No. | Date | Filer | District | Chapter (at filing) | Disposition |
|---|---|---|---|---|---|
| 95-24161 | 10/19/1995 | Wife (as Carolyn A. Suddth) | W.D.Pa. | 7 | Chapter 7 discharge entered 1/31/1996 |
| 97-13809 | 4/9/1997 | Husband | D. Md. | 7 | Chapter 7 discharge entered 7/28/1997 |
| 18-00338 | 4/11/2018 | Joint | N.D. WV | 13 | Converted to Chapter 7 and discharge entered 3/12/2019 |
| 19-70483 | 8/7/2019 | Joint | W.D. Pa. | 13 | Dismissed for failure to file information |
| 19-70748 | 12/11/2019 | Joint | W.D. Pa. | 12 | Ongoing – current case |

Despite the existence of five cases between the Debtors, only three are relevant to the 11 U.S.C. § 362(d)(4) determination. This is because the earlier two cases, filed by the Debtors individually in 1995 and 1997, occurred prior to the Debtors acquisition of title to the Property on January 13, 2003,[6] and its

---

[6] Exhibit W contains a deed transferring the Property from its prior owners to the Debtors as of January 13, 2003. During her testimony, Mrs. Reckart started that she lived on the Property and "started buying" it by making payments while still married to her prior husband, but that the purchase was finalized later when married to the Debtor-Husband. <u>See</u> Transcript 36-37. The details of Mrs. Reckart's "rent-to-own" or land installment contract arrangement are unknown. As is whether under that arrangement, Mrs. Reckart and her prior husband had any cognizable property interest at the time of their chapter 7 filing. Regardless, this is of no moment as there is no

later encumbrance by SECU on September 25, 2013. <u>See</u> <u>In re Gray</u>, at 168 ("The statute requires that the scheme relates to property for which [moving party] is the creditor, not just any real property.") Moreover, the earlier two filings occurred prior to the Debtors' marriage, with Mrs. Reckart's 1995 filing being joint with her prior husband (<u>See</u> Combined Exhibits 53-54). Thus, negating that the two were acting in concert or as part of a scheme in filing those respective bankruptcy cases.

That leaves the three most recent bankruptcy case filings (including the current filing). The Court must determine whether more than one (i.e. multiple) involve a "scheme" to "hinder, delay or defraud" SECU.

<u>Bankruptcy Case No. 18-00338</u>

Bankruptcy case no. 18-00338 was commenced under chapter 13 by the Debtors jointly on April 11, 2018.  In that case the Debtors filed a chapter 13 plan, but were unable to make all the required payments. <u>See</u> Exhibit J 2, Combined Exhibits 68, ECF No. 99-1.[7] Upon the recommendation of their counsel, the Debtors converted the case to chapter 7 after seven months and later received a discharge on March 12, 2019. <u>See</u> Transcript 27:10-11.

---

allegation that a creditor secured by the Property existed to "delay, hinder or defraud" by the filing of the 1995 bankruptcy.

[7] Debtors averred in their *Response to Motion for Prospective In Rem Relief From the Automatic Stay*, ECF No. 74, that they made payments pursuant to their chapter 13 plan filed in this case prior to conversion. However, no detail has been presented to the Court concerning the frequency and amount of these payments. <u>See</u> ECF No. 74 at ¶ 8(c).

<u>Bankruptcy Case No. 19-70483</u>

Debtors commenced their second chapter 13 case on August 7, 2019 by pro se filing. Mrs. Reckart testified that, although formally pro se, she initially received guidance from an attorney who afterwards became ill and could no longer assist her.  Mrs. Reckart stated that the bankruptcy "overwhelmed" her and she could not complete the required forms. <u>See</u> Transcript 27:20-28:3. The case was dismissed for failure to meet certain filing requirements, but reconsideration was granted upon request of the Debtors. Despite this, some or all of those filings remained outstanding and the case was finally dismissed on November 26, 2019.

<u>Bankruptcy Case 19-70748</u>

Debtors then jointly commenced the present case on December 11, 2019. In contrast to the two previous cases, the Debtors filed this case under chapter 12 of the Bankruptcy Code. The Debtors testified that this was the first time chapter 12 was presented to them as an option.  After obtaining extensions, the Debtors completed their schedules and timely filed their chapter 12 plan on May 24, 2020 (the "<u>Plan</u>"). Pursuant to the Plan the Debtors propose to pay SECU's claim under modified terms with Plan payments commencing in June 2020. <u>See</u> Plan § IV, ¶ 1, ECF No. 59.  Mrs. Reckart testified that as of the hearing date, September 17, 2020, that the Debtors had made three payments under the Plan. <u>See</u> Transcript 10:5-24. Post-hearing, the Chapter 12 Trustee filed, and this Court takes judicial notice of, a *Trustee's Report of Receipt and Disbursements* indicating that, as of November 30, 2020, the Chapter 12 Trustee had received

five plan payments. <u>See</u> ECF No. 123. The Court also takes judicial notice that prior to the conclusion of briefing on this matter, the Debtors' Plan was confirmed on an interim basis. <u>See</u> Order of Court Confirming Plan as Modified and Setting Deadlines for Certain Actions, ECF No. 118.

Upon review of these case histories, the Court does not find a "scheme" by the Debtors involving multiple bankruptcy filings. Although the Debtors' second chapter 13 case was dismissed for failure to complete their filings, no pattern exists across multiple cases showing a lack of prosecution or lack of intent to reorganize. To put it another way, the weight of the evidence does not support a finding that the Debtors' sought bankruptcy protection only to stall the foreclosure.

Notably, even after it became clear that the Debtors would not succeed in their first chapter 13 case (18-00338), they did not abandon the filing.  The Debtors instead continued to pursue the case post-conversion and obtained a chapter 7 discharge. While not the reorganization they hoped for, the effect of a chapter 7 discharge is to improve the financial condition of the Debtors by discharging applicable unsecured debts. Thus, their condition could not be said to have no improvement or remain unchanged.

More importantly, however, is that there is no evidence of a scheme in the present case in which they have timely filed their schedules and Plan, and have been making payments thereunder. As such, the Debtors have shown an intent to prosecute their bankruptcy case and reorganize.

Also supporting this finding is that the Debtors have not employed a "tag-team" approach to their filings, with one spouse filing and upon dismissal of that case the other spouse filing with the object of maximizing the duration of their collective bankruptcy cases and the automatic stay protections thereunder.

Nonetheless, in addition to allegations of "bad faith" discussed below, SECU assigns significance to certain discrepancies between and omissions in the Debtors' schedules filed in case no. 18-00338 and the current matter. As well as the fact that the 18-00338 bankruptcy was filed in the Northern District of West Virginia, when the Debtors resided in the Western District of Pennsylvania.

As for the discrepancies, the Debtors' credibly testified that their prior counsel completed much of their bankruptcy schedules and failed to review them with the Debtors prior to filing. <u>See</u> Transcript 74:10-16.  While it is true that the Debtors will ultimately be responsible for the contents of their filings, the Debtors' testimony causes this Court to find no insidious or deceitful intent behind the discrepancies. A similar lack of intent is attributable to the errant decision to file in the Northern District of West Virginia, which the Debtors credibly testified was done on the recommendation of prior counsel and that counsel's explanation that location did not matter as it was "a federal deal." <u>See</u> Transcript 26:5-11.

However, this finding does not give the Debtors a free pass to file inaccurate information and fail to meet certain filing requirements.  As noted by SECU the Debtors have failed to file their 2018 and 2019 tax returns, and several

15

monthly operating reports remain outstanding.  These documents are essential for the Debtors to achieve reorganization and must be completed. While the Court has concerns regarding the Debtors failures to file these documents to date, it is not sufficient to establish a lack of intent to prosecute and reorganize when the Debtors are currently making payments under their Plan; especially in view of the harshness of an award of in-rem relief.

Bad Faith

Relevant to the "scheme" discussion is SECU's averment that the current bankruptcy case was filed in "bad faith." Specifically, SECU avers that a presumption of bad faith exists pursuant to 11 U.S.C. §§ 362(c)(3)(C)(i)(II) and (III). SECU alleges that these sections provide for a rebuttable presumption of bad faith where the debtor was a debtor in a case dismissed within a one-year period after failure to make certain filings or amendments, or if there has been no substantial change in the debtor's circumstances. See SECU Brief 3-10.

Taking SECU's interpretation of these sections at face-value would seem to impose a significant hurdle for the Debtors in the form of a presumption rebuttable only by clear and convincing evidence. However, upon closer inspection of the words of the statute, it becomes clear that the presumption imposed under 11 U.S.C. §§ 362(c)(3)(C)(i)(II) and (III) is inapplicable in this case for two reasons.

First, it is the plain text of section 362(c)(3)(C) that subparagraph (C) is "for purposes of subparagraph (B)," which concerns a debtor's motion for the

continuation of stay otherwise set to expire within 30 days of filing in accordance with 11 U.S.C. § 362(c)(3)(A).  That is not the matter before the Court.

Second, section 362(c)(3) makes the subparagraphs of section 362(c)(3)(C) applicable in instances where "a single or joint case is filed by or against a debtor who is an individual in a case under chapter 7, 11, or 13, and if a single or joint case of the debtor was pending within the preceding 1-year period but was dismissed, . . . ."  Here, a joint case was filed by the Debtors in a case under chapter 12, which is omitted from the list of applicable chapters.

Accordingly, no presumption of bad faith arises under 11 U.S.C. §§ 362(c)(3)(C)(i)(II) and (III).  However, that does not end our "bad faith" inquiry.

Turning to other bases for finding "bad faith," in <u>Olayer</u>, the court noted that strategically timing a bankruptcy can be a legitimate tactic available to debtors, "but it evokes bad faith where a debtor commences a bankruptcy case 'without the ability or the intention to reorganize.' " <u>Olayer</u>, at 469 (quoting <u>Mazza</u>, at *5).

SECU contends that this case was commenced in bad faith by reason that the Debtors cannot and do not intend to reorganize their debts.  Chief among their arguments is the timing of the filings and SECU's contention that the Debtors own schedules show a lack of funds to support a chapter 12 plan. SECU points to the Debtor's Schedules I and J, which reflect a negative net income from operation of their farm/business of -$2,113.00 per month and an overall negative net income of -$157.65 per month. <u>See</u> Combined Exhibits 292-293, ECF No. 99-1. SECU also argues that the various alternative revenue streams

the Debtors testified regarding (i.e. raising of goats, increasing rat breeding, Mr. Reckart's resumption of commercial trucking, Mrs. Reckart's reinstatement of nursing license, adding overnight and "poker" trail rides, establishing a "GoFundMe", etc.)   remain speculative despite testimony being taken nine months after the commencement of the case.

The Court agrees that the Debtors' failure to pursue these alternative revenue streams at any point earlier in the bankruptcy (or during the prior bankruptcies) does not reflect well on the Debtors' position.

Nonetheless, the Court must also acknowledge that the Debtors have not exactly sat on their proverbial hands throughout this bankruptcy.

As SECU points out in the Relief From Stay Motion, at the time of filing the Debtors were encumbered with "substantially more mouths to feed than they can possibly afford." See Relief From Stay Motion ¶ 9.  As highlighted by SECU, the Debtors' schedules provide that by way of "Farm Animals," the Debtors had 22 horses/ponies, 12 pigs, 5 goats, and 1 donkey.[8]  Faced with the expense of these animals, the Debtors stated on the Schedule I that they "plan[ ] to radically reduce business e[xp]enses by getting rid of unproductive animals." See Combined Exhibits 293, ¶ 13. And per their testimony, the Debtors have taken steps in doing so.  At the hearing, Mrs. Reckart testified that presently, the Debtors had "13 horses, two colts, a donkey, and a pony[,]" and that they had four goats left. See Transcript 11:11-12, 19:1.  Reflecting a decrease by six horses/ponies and one goat. Unfortunately for our purposes, the Debtors did not

---

[8] The Debtors also have various non-farm animals.

elaborate on the specifics on how this decrease affected their financials, other than to say that they are "cutting down on expenses." Transcript 47. However, what is evident is the Debtors have proposed a chapter 12 plan, obtained interim confirmation, and are making payments thereunder.

Although SECU raises valid concerns regarding the Debtors' financials as reflected in their Schedules I and J, and highlights the issue of farm-generated income as reflected in the Debtors monthly operating reports, the Court is reluctant to hold that the Debtors are without the intention or ability to fund a plan, or that they are acting in bad faith, when they are currently making Plan payments and are actively decreasing expenses.

B.     Relief Under 11 U.S.C. §§ 362(d)(1) and (2)

Sections 362(d)(1) of the Bankruptcy Code provides for the granting of relief from the automatic stay "(1) for cause, including the lack of adequate protection of an interest in property of such party in interest." Relief under section 362(d)(2) is appropriate when "(2) with respect to a stay of an act against property under subsection (a) of this section, if--(A) the debtor does not have an equity in such property; and (B) such property is not necessary to an effective reorganization[.]"

As aforementioned, in their Relief From Stay Motion, SECU averred that relief was warranted under § 362(d)(1) for cause for various reasons including lack of adequate protection, failure to file tax returns, and lack of good faith. See Relief From Stay Motion 5. However, in their post-hearing brief SECU only argues in relation to relief under § 362(d)(1) that cause exists due to the Debtors failure

to make all post-petition payments under the terms of the Note. Thus, SECU argues that the Debtor must show adequate protection.

The Court finds the Debtor's history of payment to SECU concerning as at the time of the Joint Pretrial Statement (which was prior to the Trustee's first distribution of Plan funds) payment on the Note was due for December 2016. Joint Pretrial Statement 11, § VIII(A)(3). However, the evidence is that the Debtors are now making Plan payments, which include payments on SECU's claim at the modified terms.  As long as the Debtors continue in these payments such payments constitute adequate protection for SECU.[9]

As for § 362(d)(2), the parties stipulated that the Debtors lack equity in the property and that the Property's value is below the amount due on SECU's proof of claim. See Joint Pretrial Statement 4, ¶¶ 19-20. Nonetheless, the Property is necessary for an effective reorganization as the Property contains both the Debtors' residence and farm.

As discussed above, a chapter 12 Plan has been filed pursuant to which the Debtors are making payments rendering it sufficiently in prospect for purposes of the Relief From Stay Motion.  United Sav. Ass'n of Texas v. Timbers of Inwood Forest Assocs., Ltd., 484 U.S. 365, 375–76, 108 S. Ct. 626, 633, 98 L. Ed. 2d 740 (1988)(discussing that the property must be needed for an effective reorganization that is in prospect).

---

[9] This was reflected in the Interim Confirmation Order providing that: "Plan confirmation is on an interim basis only as a form of adequate protection." See Interim Confirmation Order ¶ C.

While there may be some question as to whether the farm component generates sufficient income to be necessary for the Debtors' reorganization, what is not in question is that the Debtors require a residence. While SECU suggests that the Debtors can simply relocate their farmstead as Mrs. Reckart and her former spouse did in the early-1990s, the Court recognizes the complications to relocation imposed by the numerous animals in the Debtors care and possession.  Unlike some other debtors, the Reckarts cannot simply relocate to any available housing—such as an apartment or a home in a densely populated area.[10]

Moreover, depending on how far away the Debtors are forced to relocate, the Court notes that such a move could detrimentally effect the Debtors by terminating the financially beneficial arrangement they have with their current neighbors, under which the Debtors' horses are permitted to graze on the neighbors' lands for free.

### III.

For the forgoing reasons, the Court finds that relief from stay under 11 U.S.C. § 362(d)(4) is not warranted. The Court also finds that relief under 11 U.S.C. §§ 362(d)(1) and (d)(2) should not be exercised at this time. However, SECU has raised valid concerns regarding the Debtors' financials and failure to

---

[10] By this the Court does not intend to imply that relocation of a debtor under any circumstances is ever "easy" or without burden. This Court has stated time and again that it recognizes that "a man's home is his castle," and that losing one's residence against one's will is never "simple" or without challenge (mental, emotional, physical, etc.) By the above statement, the Court merely intends to highlight the additional complication of space and location requirements necessary to adequately care for the Debtors' farm animals.

file tax returns and monthly operating reports.  In light of this, the Court will

enter an order conditionally granting relief from stay pursuant to 11 U.S.C. §

362(d)(1).  The effect of this order will be that relief will be granted under that

section, but such relief will be stayed pending the Debtors' compliance with

certain directives, including the timely payment of Plan payments as adequate

protection and the filing of outstanding documents.

Dated: January 14, 2021

_____ jlh
Jeffery A. Deller
United States Bankruptcy Judge

Case Administrator to Mail to:

Debtors
Justin P. Schantz, Esq.
Jill Manuel-Coughlin, Esq.
Ronda J. Winnecour, Chapter 12 Trustee

FILED
1/14/21 5:34 pm
CLERK
U.S. BANKRUPTCY
COURT - WDPA